# FEDERAL DEFENDER SERVICES OF WISCONSIN, INC.

LEGAL COUNSEL

Craig W. Albee, Federal Defender
Krista A. Halla-Valdes, First Assistant

Guy Cardamone, Madison Supervisor
John W. Campion
Alexandra Douglas
Ramuel R. Figueroa
Matthew Giesfeldt
Jonathan Greenberg
Gabriela A. Leija
Julie K. Linnen
Dennise Moreno
Tom Phillip
Alex Vlisides

411 East Wisconsin Avenue
Suite 2310
Milwaukee, Wisconsin 53202

Telephone 414-221-9900
Facsimile 414-221-9901

March 13, 2026

Honorable Brett H. Ludwig
U.S. District Court
517 East Wisconsin Ave.
Milwaukee, WI 53202

Re:     *United States v. Alexis Juarez*
        Case no. 25-cr-37

Dear Judge Ludwig,

Alexis Mendoza-Juarez grew up in one of three states that automatically prosecute seventeen-year-olds as adults. This arbitrary fact not only shaped his adolescence, but the criminal record this Court will consider when deciding a just sentence. At sentencing, the parties will jointly recommend a **total sentence of 84 months imprisonment**—a recommendation driven in significant part by the developmental stage at which Alexis first encountered the adult criminal justice system.

Alexis was sixteen years old when he committed his first offense but was charged as an adult. His second offense and conviction occurred when he was 17 years old. Indeed, six of his seven criminal history points are assessed for convictions that occurred during an age at which most young people across the country are treated as juveniles. Wisconsin remains one of three states that automatically prosecute seventeen-year-olds in the adult criminal justice system without any consideration of its appropriateness. As a result, conduct that would have been addressed in the juvenile system in most jurisdictions

instead produced adult criminal consequences at a time when Alexis was legally and developmentally an adolescent.

The consequences of Wisconsin's choice to charge minors as adults as a matter of course are significant to the sentencing before this Court. A seventeen-year-old in Wisconsin who commits the same conduct as a seventeen-year-old in most other states faces a dramatically different legal trajectory. Yet, the disparity is not the product of heightened culpability—it is the result of geography.

For Alexis, this arbitrary disparity was compounded by the circumstances of his upbringing. He was raised primarily by his mother, a single parent who was herself navigating extraordinary challenges. She was the survivor of domestic violence and a noncitizen with limited financial resources and institutional support. Alexis' father was largely absent after his parents separated, and Alexis' mother took on several jobs in an effort to make ends meet, so Alexis lacked supervision and stability throughout his adolescence. In practical terms, this meant that Alexis grew up without many of the structural safeguards—stable parental supervision, financial resources, or legal advocacy—that often help prevent youthful mistakes from becoming permanent adult criminal consequences.

To be clear, these circumstances do not excuse Alexis' conduct. But they provide essential context for understanding how a young person, still navigating adolescence and raised in an environment marked by instability and limited resources, became exposed to adult criminal penalties that most youths across the country would never face. In addition to these lifelong consequences, Alexis' U.S. guidelines will also recommend harsher punishment than for similarly situated individuals who were charged as juveniles—not based on any individualized assessment of culpability, but simply because they don't live in Wisconsin.

Against that backdrop, the parties' joint recommendation of 84 months' imprisonment represents a sentence that appropriately balances accountability with fairness. It reflects the seriousness of the offense and the need for deterrence and protection of the public, while also recognizing the developmental realities of youth, Alexis' personal history, and the unique structural and environmental factors that shaped his early involvement with the criminal justice system.

When the Court considers the totality of the circumstances—including Alexis' background, the developmental stage at which much of his criminal exposure began, and

the disparities created by Wisconsin's adult-seventeen rule—the jointly recommended sentence provides a fair, proportionate, and appropriate resolution consistent with the goals of federal sentencing. For these reasons, and as explained more fully below, the Court should adopt the parties' joint recommendation and impose a total sentence of 84 months' imprisonment.

### I.  A childhood marked by poverty, violence, neglect, and instability provides critical context for sentencing.

Alexis was raised in a home that he describes as loud and chaotic. His father, Adrian, was rarely present and, when he was home, the family lived on edge. Adrian worked long hours and slept during the day on weekends, and if the children woke him or made too much noise, he responded with yelling and physical violence. Alexis also recalls violence in the home directed at his mother. From an early age, Alexis learned that home was not a place of safety or stability.

When Alexis was eight or nine years old, Adrian left for good. His departure ended one form of instability but deepened another. Alexis's mother, Silvia, was left to support the family on her own. Silvia was a noncitizen whose own family remained in Mexico, so she had no support network to fall back on. She worked second shift to earn a little more money to keep the family housed, but that meant she often left the home before the children woke up and returned after they were asleep. As a practical matter, the children raised one another.

The family often lacked basic necessities, including food, clean clothes, and shoes that fit. There was no one consistently available to enforce routines or bedtimes or homework, no one to provide the kind of consistent parental guidance that most children take for granted. Alexis has a memory from fifth grade that captures his family's financial hardship well. His classmates were talking about Christmas celebrations, and Alexis could not relate. His teacher learned of the financial hardships of the family and made sure the class exchanged gifts. It was one of the only times Alexis remembered receiving a present. That memory captures how early and how deeply poverty shaped his childhood.

Adrian's absence was not merely physical. After he left, he provided no meaningful support. Alexis and his older brother sometimes looked for him in the neighborhood after spotting his truck. If they found him, he might give them a few dollars, but he did not meaningfully respond when the children described to him how they were struggling. As

Alexis became a teenager, he and his brother Marcos learned when Adrian lived. Adrian told the kids that the door was always open for them and that they could stay when they needed. But when they did, there was never any food in the house and almost no furniture other than a bed. Alexis thus grew up with the instability of abandonment layered on top of material deprivation.

The home became even more unstable when Silvia entered a relationship with Michael Alvarado. From the beginning, the relationship between Michael and the children was hostile. He demanded obedience from children who had largely been left to raise themselves, but offered no support, affection, or guidance in return. The children also came to understand that Michael was tied to their parents' breakup, which made the tension at home even more difficult to bear. The result was a household defined by conflict. Alexis increasingly avoided home and instead found refuge at the house of a close friend, Anahi, whose mother, Alejandra, made sure he had food and a place to sleep. In many respects, Alejandra became the most stable adult presence in his adolescence.

That instability eventually pushed Alexis out of the home altogether. When he was about thirteen, his older brother Marcos got into a physical altercation with Michael, and Silvia threw Marcos out. Alexis left with him. For roughly a year, Alexis cycled between Anahi's house, his father's mostly empty apartment, and the streets. At times, he was effectively homeless. When Marcos later entered a group home, Alexis was left entirely on his own. He tried to work but was told he was too young. Eventually, hungry, exhausted, and out of options, he returned to his mother's house because he needed to eat and had nowhere else to go.

Not surprisingly, Alexis's education deteriorated under those conditions. He attended St. Adalbert's, then Bay View, and later Synergy Alternative School, but eventually stopped going altogether. He has explained that part of the reason for dropping out of school was practical and humiliating: he often did not have clothes that fit or clean clothes to wear, and peers mocked him for his struggles. School did not function as a protective factor in his life; it became another place where poverty and instability were exposed.

His substance abuse also began early and in that same context of chaos and neglect. Alexis began using marijuana at eleven and alcohol at twelve. By his early teens, marijuana use had become daily. By fifteen, he was using Xanax daily as well. He later used ecstasy and alcohol together. This pattern does not reflect ordinary adolescent experimentation so much as a child and then a teenager self-medicating, coping, and adapting within an

environment that lacked safety, supervision, and support. By sixteen, Alexis was effectively on his own—without a diploma, income, adult guidance, or any realistic access to lawful work. In that setting, he began selling drugs. And committed his first offense shortly after.

**II.     When viewed in full context, Alexis' criminal record does not reflect a pattern of entrenched criminality, but rather a young man whose adulthood was delayed by instability, addiction, and years of incarceration.**

In January of 2017, sixteen-year-old Alexis was charged with Fleeing and summons to appear in court. PSR at 13, ¶ 50. The letter went to his mother's old address, so he didn't receive the notice, missed court, so a warrant was issued for his arrest. He was arrested in September of 2017 and released on bond. However, less than two weeks later, Alexis was arrested for possessing a concealed weapon and charged with a second case. Alexis was now 17 years old and continued selling and using drugs. Two months later, in November of 2017, Alexis shot someone during a drug deal gone bad and was charged with the shooting and the drug dealing. Alexis was under the influence of narcotics when he committed this offense.

Alexis was sentenced to prison at 18 years old after the Court determined that he was competent to proceed.[1] He served five years of imprisonment and released when he was 22 years old on November 15, 2022. He quickly got a job as a dishwasher and busboy at a local restaurant, but he lost that job when he was arrested for possessing marijuana and was given a short imprisonment sanction of the supervision violation. *See* PSR at ¶40. Alexis struggled with depression, financial instability, and resentment from his mother. He had been in prison since turning 18, continued to use illegal substance while in custody, had not learned any coping skills—so he faced substantial struggles to maintain his sobriety.

Upon his release, his mother took him in. She had kicked Michael out of the house for cheating on her, so Alexis agreed to go back home. But the invitation back home came with unmet expectations. Alexis' mother argued with him often about finding a job because she couldn't make ends meet. He recalls Silvia telling him that she had kicked her boyfriend out of the house for Alexis and he wasn't "helping her with the bills." Rather than helping and supporting Alexis through his reentry transition, Silvia had an

---

[1] *See* Milwaukee case no. 17CF4152 (January 17, 2018, & June 17, 2019 entry); *and* 17CF4543 (June 17, 2019, entry).

apparent expectation that Alexis would provide *her* support, including the financial support that her ex-partner provided in the home. She eventually kicked him out and told Alexis that she regretted taking him back in because all he did was create another burden for her and made her house stink. Alexis returned to drug dealing, but that only lasted a few months before he was arrested for the instant offense.

Alexis was imprisoned between ages 17 and 22 years old (except for 53 of those days). When he was released at 22, he lacked stable housing, employment, and social support. He did well for about five months before he was ordered to serve a jail sanction for the possession of marijuana and was unable to find his footing again after his release and faced struggles that led to short jail sanctions as alternatives to revocation.

Twenty-three-year-old Alexis went into custody on May 18, 2024, for the instant offense, and he will be serving a revocation sentence until June of 2030, when he is 29 years old. He will then continue to be on DOC supervision until he is 32 years old. And if he does not succeed on supervision, he will go back to prison for another 3 years.

Repeated incarceration during the critical transition from adolescence to adulthood has prevented Alexis from developing the stability courts typically expect of adult defendants. The years between the late teens and mid-twenties are ordinarily when people learn to maintain employment, manage finances, build relationships, and develop the daily routines that anchor stable and law-abiding lives. Alexis has had almost no opportunity to do that. He entered the criminal justice system at seventeen and has spent the overwhelming majority of the years since in custody, with only brief and unstable periods in the community—periods not marked by opportunity, but by financial desperation, strained family relationships, and the absence of any meaningful support system.

The numbers tell that story plainly. Alexis went into custody at seventeen. He was released at twenty-two. He was back in custody within months. He will not be released again until he is twenty-nine years old. Between the ages of seventeen and twenty-nine — the years during which most people build the foundation of their adult lives — Alexis will have spent approximately nineteen months outside of a correctional facility.

Nineteen months. In twelve years.

Judge Brett H. Ludwig
March 13, 2026
Page 7

That is not a record of someone who squandered opportunities. It is the record of someone who has barely had any. It is the record of a young man who spent the years most people use to grow into adulthood learning, instead, to survive incarceration.

### III. Alexis's Criminal History Overstates His Culpability Because It Is a Product of Geography, Not Heightened Dangerousness.

As noted above, Wisconsin is one of only three states that automatically prosecutes seventeen-year-olds as adults. In every other state, a court must make an individualized determination that considers the minor's maturity, culpability, and amenability to rehabilitation before a teenager can be transferred to adult court. Wisconsin makes no such determination. It treats seventeen-year-olds as adults as a matter of course, without any individualized assessment, and the consequences of that policy follow a person for life.

Those consequences are reflected directly in Alexis's criminal history score. Six of his seven criminal history points arise from conduct he committed at sixteen and seventeen years old. Had Alexis grown up in any of the forty-seven states where juvenile jurisdiction extends through age seventeen, that conduct would almost certainly have been handled in juvenile court. Juvenile proceedings are designed to emphasize intervention and rehabilitation rather than permanent criminal punishment. As a result, juvenile adjudications generally do not produce the same lifelong criminal record consequences as adult convictions. This difference is not based on culpability, but on a difference in zip code.

That disparity is directly relevant to this Court's analysis under 18 U.S.C. § 3553(a). One of the central purposes of federal sentencing is to avoid unwarranted disparities among similarly situated defendants. A seventeen-year-old in Georgia or Texas who committed the same conduct as Alexis would face the same automatic adult prosecution. A seventeen-year-old in any of the other forty-seven states would not. The guidelines do not account for that disparity. They treat Alexis's adolescent convictions the same as they would treat convictions earned by a fully culpable adult — because the guidelines have no mechanism to ask whether those convictions should have been adult convictions in the first place.

This Court does have that ability. When evaluating the weight to assign Alexis's criminal history, the Court should account for the fact that much of it exists not because Alexis was more culpable or more dangerous than similarly situated adolescents elsewhere in

the country, but because he happened to grow up in one of three states that made that determination for him — automatically, categorically, and without any consideration of who he actually was.

## IV.   Alexis's Criminal History Is a Product of Adolescence, Not Character.

Wisconsin's insistence on cutting off juvenile jurisdiction at 16 years old not only creates unwarranted disparities, it also goes against decades of research confirming that adolescent brains are fundamentally different from adults, particularly in the areas that govern decision making, impulse control, and risk management.[2] Experts agree that the prefrontal cortex of the brain, which is tasked with controlling impulses, "is among the last brain regions to develop."[3] So, even "when teenagers' cognitive capacities come close to those of adults, adolescent's *judgment* and their decisions may differ from adults as a result of psychosocial immaturity."[4] The research is so well established that even the sentencing commission has recognized that "people may not gain full reasoning skills and abilities until they reach age 25 on average."[5]

The U.S. Supreme Court similarly counsels that a young person's criminal conduct should be treated differently than that of an adult because children have "diminished culpability."[6] The Court has identified three characteristics of youth that distinguish

---

[2] *Commonwealth v. Mattis*, SJC-11693 (Mass. Dec. 16, 2022) ("Neuroscientist's Amicus") (collecting the "scientific consensus" that "fundamental changes in brain development occur through late adolescence").
[3] *See Mattis*, at 422.

[4] *See* Steinberg, L., et. al, *Less Guilty by Reason of Adolescence: Developmental Immaturity, Diminished Responsibility, and the Juvenile Death Penalty*, 58 Am. Psychol. 1009, 1012 (2003) (emphases added); Steinberg et al., *Around the world, adolescence is a time of heightened sensation seeking and immature self-regulation*, 21(2) Dev. Sci. 2, 15–16, 20 (2018).

[5] *See* USSC, *Youthful Offenders in the Federal System* 5 (2017) ("Youth Offense Report").
[6] *See Roper v. Simmons*, 543 U.S. 551, 569-571 (2005); *Graham v. Florida*, 560 U.S. 48, 75 (2010); *Miller v. Alabama*, 567 U.S. 460, 471 (2012); *Montgomery v. Louisiana*, 577 U.S. 190 (2016); *see also J.D.B. v. North Carolina*, 564 U.S. 261, 274 (2011) ("[C]hildren cannot be viewed simply as miniature adults."); *Thompson v. Oklahoma*, 487 U.S. 815, 835 (1988) ("[L]ess culpability should attach to a crime committed by a juvenile than to a comparable crime committed by an adult"); *Eddings v. Oklahoma*, 455 U.S. 104, 115 (1982) ("[Y]outh is more than a chronological fact. It is a time and condition of life when a person may be most susceptible to influence and psychological damage.").

Judge Brett H. Ludwig
March 13, 2026
Page 9

adolescent offenders from their adult counterparts — and all three are present here with particular force.

The first is that young people's lack of maturity and underdeveloped sense of responsibility leads to recklessness, impulsivity, and heedless risk-taking.[7] That is not a description of a moral failing unique to Alexis—it is a description of adolescent development. And it describes precisely the context in which Alexis committed the offenses that make up his criminal history: a teenager, without adult supervision or guidance, making impulsive decisions in environments he had no power to leave.

The second is that young people have limited control over their own environment, making them more vulnerable to negative influences and outside pressures—including from family and peers—and less able to extract themselves from crime-producing settings.[8] Alexis did not choose to grow up in poverty. He did not choose to be effectively homeless at thirteen. He did not choose to have a father who abandoned him or a mother who worked through the night and could not be there when he needed her. He was placed in those settings by circumstances entirely outside his control, and he lacked the maturity, resources, and support to find his way out of them.

The third is that because a young person's character is less fixed than an adult's, youth carry a heightened capacity for change and rehabilitation as they mature.[9] This factor cuts most directly against treating Alexis's adolescent record as a reliable predictor of who he is today. He committed those offenses between the ages of sixteen and seventeen. He is now twenty-five. The science—and the Supreme Court—recognize that the person who stands before this Court is not the same person who made those decisions almost a decade ago.

The penalties and guidelines do not adequately account for Alexis' "lack of maturity [and] underdeveloped sense of responsibility lead[s] to recklessness, impulsivity, and heedless risk-taking;" "limited control over [his] environment" and "vulnerab[ility] to negative influences and outside pressures, including from family and peers" and

---

[7] *Miller*, 567 U.S. at 471 (quoting *Roper*, 543 U.S. at 569).

[8] *Id.*

[9] *Id.*; *Montgomery*, 577 U.S. at 207–08.

diminished ability to remove himself from "crime-producing settings."[10] Rather, they treat Alexis as a fully grown, "fixed," individual who does not have a heightened capacity for change as he matures.[11] Even before he is sentenced on this case, Alexis will not be released from custody until he is 29 years old—an age when statistically recidivism declines.[12]

Recognizing this context does not excuse Alexis' priors or instant offense. But it does provide important perspective when assessing both the weight that should be given to his criminal history and the sentence that is sufficient—but not greater than necessary—to achieve the purposes of sentencing.

## V.      The recommended sentence reflects the developmental realities of youth and Alexis' capacity for change.

Despite the many challenges Alexis has faced in his short life, he has maintained meaningful connections with his siblings, including his sister Leydi and his brother Samuel. Alexis also continues to communicate with his mother, and although their relationship has been strained by emotional and financial challenges, both have worked to improve that relationship over time. Alexis is pained by their history, but he describes his mother today as hardworking and as someone who did the best she could under extremely difficult circumstances.

Alexis' life also reflects a longstanding struggle with substance use that began during his adolescence. He first experimented with marijuana at age eleven and alcohol shortly thereafter. As he grew older and increasingly lacked structure and supervision, his substance use escalated. Mr. Juarez now recognizes that his substance use played a role

---

[10] *Miller*, 567 U.S. at 471 (quoting *Roper*, 543 U.S. at 569) (internal marks omitted).

[11] *Id.*; *Montgomery*, 577 U.S. at 207–08.

[12] *See, e.g.*, U.S. Sentencing Commission, *The Effects of Aging on Recidivism Among Federal Offenders* 11 (2017), https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2017/20171207_Recidivism-Age.pdf; U.S. Dep't of Justice, Bureau of Justice Statistics, *2018 Update on Prisoner Recidivism: A 9-Year Follow-Up Period (2005-2014)* 6-7 (2018), https://www.bjs.gov/content/pub/pdf/18upr9yfup0514.pdf (study of prisoners released in 30 states in 2005 showed that 90% of those released under ager 25 were rearrested within nine years, compared with 83% overall), https://bjs.ojp.gov/content/pub/pdf/18upr9yfup0514.pdf.

in many of the poor decisions he made during that period of his life, including his most serious offense at 17 years old.

Importantly, Alexis has also demonstrated a willingness to work toward change. While incarcerated, he completed the Challenge Incarceration Program (CIP) and earned his GED in 2021 at Racine Youthful Offender Correctional Institution. He has also participated in programming such as anger management and has expressed a strong interest in engaging in additional treatment and counseling.

Alexis also has concrete plans for his future. He hopes to obtain a barber's license and eventually open a barbershop, "Everyone will always need a haircut," he said. And he is hopeful that the skill will give him job security, no matter what the future holds for him. He has also expressed interest in vocational training programs, including culinary training currently offered at his facility. If those opportunities are not available, he plans to obtain a commercial driver's license (CDL) and pursue work in transportation or delivery services. These goals reflect a desire to build stability and lawful employment upon release.

Alexis' story is not one of someone who grew up surrounded by stability and opportunity. Rather, it is the story of a young man who spent much of his adolescence navigating poverty, neglect, and substance abuse. These circumstances do not excuse his conduct. But they do provide important context for understanding the developmental environment in which he grew up and the challenges he faced during critical formative years.

When the Court considers Alexis' background together with his demonstrated capacity for growth, the parties' joint recommendation of 84 months' imprisonment represents a sentence that appropriately balances accountability with fairness and recognizes the full context of Alexis' youthful decision making and potential for growth.

### VI. The Court should consider the total punishment resulting from state and federal sentences for the same conduct.

Alexis is serving a revocation sentence arising from the same conduct in this case. Alexis waived his revocation hearing and admitted to failing to report for about a month and being in possession of a firearm and illegal substances on May 18, 2024. Alexis' agent's revocation report also included the allegations stemming from a rollover accident on March 24, 2024, detailed in ¶ 38 of the PSR. Alexis was not the driver and denied the

alleged violations during the revocation proceedings, and the department did not seek to prove the allegation by preponderance of the evidence. Alexis' supervision was revoked and the sentence he was ordered to serve was for the conduct charged in the instant offense.

Accordingly, Alexis is serving a sentence of six years, 11 months, and 26 days,[13] for the same conduct charged in this case. The Court should consider that the imprisonment Alexis is serving—for the same conduct—and order Alexis' federal sentence to run fully concurrent to his state revocation sentence. This recommendation is supported by 18 U.S.C. §3584 and U.S.S.G. §5G1.3, which recognize that the Court's consideration of the combined term of imprisonment imposed across related proceedings is reasonable and proportionate.

Alexis has been in custody since May 18, 2024. On the date of sentencing, March 18, 2026, Alexis will have been incarcerated for 22 months. The Bureau of Prisons will not give Alexis custody credit for these 22 months because the time has already been credited to his state revocation sentence. Because the 22 months he has served is punishment for the same conduct, Alexis will respectfully request that the Court adjust its imposed sentence by 22 months pursuant to 18 U.S.C. §3584 and U.S.S.G. §5G1.3.

## VII.   Conclusion.

When Alexis' life is viewed in full context, his criminal history reflects less a pattern of fixed criminality than a young man whose transition to adulthood was shaped by instability, addiction, and years of incarceration that began when he was still a teenager. Alexis entered the adult criminal justice system at seventeen—an outcome that occurred not because a court determined that adult treatment was appropriate, but because Wisconsin automatically prosecutes seventeen-year-olds as adults. That decision set Alexis on a trajectory that most young people across the country would never face.

The Court must now determine a just sentence. In doing so, the Court should consider the full context of Alexis's background: a childhood marked by poverty, violence, and

---

[13] Alexis' agent provided the following summary of the revocation sentence:

I apologize for the delay. Mr. Juarez-Mendoza waived his revocation hearing. Case number 17CF4543/003 serving 8 months and 26 days. Case number 17CF4543/002 1 year, 4 months, 14 days. Case number 17CF5296 4 years, 10 months, 16 days. We do not have his release date. Please let me know if you have any further questions. "

neglect; early exposure to substance abuse; and a criminal history largely accumulated during adolescence and the earliest stages of adulthood. The Court should also consider the reality that Alexis has spent nearly the entirety of his transition from adolescence to adulthood in prison. Between the ages of seventeen and twenty-nine, Alexis will have spent only a brief period—approximately nineteen months—in the community.

These circumstances do not excuse Alexis's conduct. The offense before the Court is serious and warrants meaningful punishment. But the sentence imposed should reflect the developmental realities of youth, the structural factors that shaped Alexis's early involvement in the criminal justice system, and his demonstrated capacity for change.

The parties' jointly recommended sentence of a total 84 months' imprisonment achieves that balance. Considering that Alexis' state revocation sentence was imposed for the same conduct, he will ask the Court to run his federal sentence fully concurrent to his state sentence. To achieve a fully concurrent sentence of a total of 84 months imprisonment for his conduct, Alexis will respectfully ask the Court to adjust the 84-month sentence by 22 months. Specifically, Alexis will ask the Court to impose the following imprisonment sentence:

> 62 months of imprisonment, adjusted from 84 months to account for the defendant's confinement from May 18, 2024, to March 18, 2026, in relation to Milwaukee County Case no. 17CF4543 and 17CF5296, that would not otherwise be credited by the Bureau of Prisons, and to run concurrently with the remaining balance of the sentence imposed in Milwaukee County Case no. 17CF4543 and 17CF5296.

This recommended sentence is a substantial sentence that achieves the goals of sentencing, recognizes the unique circumstances that shaped Alexis's criminal history, and avoids imposing punishment that's greater than necessary.

For these reasons, and for those explained throughout this memorandum, the Court should adopt the parties' joint recommendation and impose a total sentence of **84 months' imprisonment** that runs fully concurrent to his state revocation sentence.

Sincerely,

**/s/ Gabriela A. Leija**